[No. 36720.   Department Two.   April 9, 1964.]

NATHAN O. GLAZER, as *Administrator, Appellant,* v. NEIL D. ADAMS *et al., Respondents.*\*

*John J. Kennett* and *Joseph T. Pemberton,* for appellant.

*Rosling, Williams, Lanza & Kastner,* by *Paul C. Gibbs,* for respondents.

WEAVER, J.—This is an action for damages for the wrongful death of Mary Glazer, alleged to be the result of the negligence of defendant, Dr. Neil D. Adams, a physician, who performed a diagnostic esophagoscopy. The jury returned a verdict for defendant. Plaintiff, as administrator

\*Reported in 391 P. (2d) 195.

of his wife's estate, appeals from a judgment dismissing his action with prejudice.

January 19 to January 22, 1960, Mrs. Glazer was hospitalized by Dr. Donald Keyes, an orthopedist, for a sprain of the neck and right ankle. She was also experiencing distress in the upper abdomen. Because of certain symptoms, he called into consultation his brother, Dr. Howard Keyes, a diagnostician and surgeon.

Laboratory tests were performed. Dr. Howard Keyes testified:

"The gastric analysis showed gross blood aspirated from either the lower end of the esophagus or stomach, and an absence of hydrochloric acid. . . ."

This was suggestive of cancer in the upper portion of the stomach or the lower end of Mrs. Glazer's esophagus.

Dr. Keyes told Mrs. Glazer that she should have a diagnostic esophagoscopy. He suggested it be done by defendant, Dr. Neil D. Adams, a specialist in otorhinolaryngology (study and treatment of ears, nose and throat). Dr. Keyes discharged her from the hospital, but requested that she return to his office in a few days. Upon her return, her symptoms were substantially the same; she had not responded to medication.

January 30, 1960, the diagnostic esophagoscopy was performed by defendant, Dr. Adams. The examination was made by inserting a metal esophagoscope down the throat into the interior of the esophagus. The esophagoscope is lighted so the operator may inspect the area in question.

During the operation, an obstruction was encountered; defendant was fully aware of it. The examination resulted in a rupture in the esophagus of approximately $\frac{3}{8}$ of an inch, 1 to 2 inches above the diaphragm. It was opposite the ninth thoracic vertebra.

One specialist testified that perforation of the esophagus is a recognized medical hazard in performing diagnostic esophagoscopies. Dr. Howard Keyes testified that there is a ". . . two per cent calculated risk, associated with this type of an examination. . . ." Defendant estimated the hazard of perforation at 2 per cent to 10 per cent. Perfora-

tion may result from a variety of conditions existing in the esophagus.

Since neither Dr. Keyes nor defendant performed open chest surgery, Dr. Hugh Trimingham, a specialist in general surgery, was called into consultation. He first visited Mrs. Glazer in the hospital at 10:30 a.m., February 1, 1960.

Although he did not find Mrs. Glazer in critical condition, he operated upon her that evening. Prior to the operation Dr. Trimingham noted a heart irregularity. She was given medication.

The operation had three phases. First, Dr. Trimingham improved the drainage of the right chest cavity by adjusting a drainage tube previously inserted. This he described as "a minor procedure." Second, he placed a second tube into the stomach below the level of the perforated esophagus ". . . to prevent a continuing flow of juices secreted by the stomach through the perforation into the right pleural space. . . ." Third, rather than feed her intravenously, he placed a tube in the lower intestines so that she could be fed for an indefinite period of time.

In short, the chest cavity was drained; stomach juices were prevented from escaping through the perforation; a means of keeping Mrs. Glazer well nourished was established. Dr. Trimingham visited Mrs. Glazer in the hospital twice a day, from February 2 until February 8, 1960. He was, in general, "pleased with her condition."

A considerable number of X-rays were taken of Mrs. Glazer on February 8, 1960, to determine "her then condition." Of her condition on that day, Dr. Trimingham testified:

"I thought she was good enough five hours before she died for me to write on the chart that I felt her condition was good enough for her to be scheduled for surgery in forty-eight hours."

Mrs. Glazer died at 9:40 p.m. February 8, 1960.

The cause of death, as listed on the death certificate, and supported by medical opinion, is as follows:

Death was caused by:

| "Immediate cause | (a) Pulmonary embolism |
| "Due to | (b) Phlebothrombosis |
| "Due to | (c) Hypostasis" |

No autopsy was performed.

Plaintiff's 28 assignments of error fall into four categories: First, four alleged errors occurring during the trial of the case; second, alleged error directed to 11 instructions given by the trial court; third, alleged error directed to the court's failure to give 12 requested instructions; and fourth, the court's failure to grant plaintiff's motion for judgment notwithstanding the verdict of the jury, or in the alternative for a new trial.

At the threshold of our consideration of this appeal, we are met with the defendant's contention in his brief, that

" . . . The record is absolutely devoid of evidence tending to establish any relationship between the perforation of January 30, 1960 and the death of the patient on February 8, 1960."

Plaintiff did not file a reply brief. We must, therefore, review carefully all the testimony relating to the diagnostic operation of January 30, 1960, and the testimony relating to the cause of death on February 8, 1960. Was there any negligence which was a *proximate cause* of the death?

■ In *Bland v. King Cy.*, 55 Wn. (2d) 902, 905, 342 P. (2d) 599 (1959), this court said:

"The test to be applied in considering the sufficiency of the evidence to establish cause of death was announced by this court in *Seattle-Tacoma Shipbuilding Co. v. Department of Labor & Industries,* 26 Wn. (2d) 233, 241, 173 P. (2d) 786 (1946), as follows:

" 'The general rule, from which this court has never deviated, is stated in 135 A. L. R. 517, as follows:'

" ' "It appears to be well settled that medical testimony as to the possibility of a causal relation between a given accident or injury and the subsequent death or impaired physical or mental condition of the person injured is not sufficient, standing alone, to establish such relation. By testimony as to possibility is meant testimony in which the witness asserts that the accident or injury 'might have,' 'may have,' or 'could have' caused, or 'possibly did' cause

the subsequent physical condition or death or that a given physical condition (or death) 'might have,' 'may have,' or 'could have' resulted or 'possibly did' result from a previous accident or injury—testimony, that is, which is confined to words indicating the possibility or chance of the existence of the causal relation in question and does not include words indicating the probability or likelihood of its existence."

" 'In *Anton v. Chicago, M. & St. P. R. Co.*, 92 Wash. 305, 159 Pac. 115, this court expressed its views with respect to such evidence, in the following language:

" ' "Taking the opinion of the witness [a medical man] for the appellant, as quoted above, at its full worth, we think it is no more than a statement of a possibility or possibly a probability, more or less remote, that the tuberculosis is a result of the injury. This is not enough. The law demands that verdicts rest upon testimony and not upon conjecture and speculation. There must be some proofs connecting the consequence with the cause relied upon. The testimony, whether direct or circumstantial, must reasonably exclude every hypothesis other than the one relied on." ' "

In *Orcutt v. Spokane Cy.*, 58 Wn. (2d) 846, 364 P. (2d) 1102 (1961), we pointed out that the

" . . . medical testimony must at least be that the injury 'probably' or 'more likely than not' caused the subsequent condition, rather than that the accident or injury 'might have,' 'could have,' or 'possibly did' cause the subsequent condition. . . . "

Having examined the testimony in the light of these rules, we fail to find substantial evidence that the perforation of Mrs. Glazer's esophagus was a probable cause of her death. No causal connection is established by the evidence.

It is, of course, more difficult to illustrate and prove the negative than the affirmative. It would serve no useful purpose for us to detail the medical testimony of the five doctors who testified. It is sufficient to sum up their testimony by stating that it was their opinion that Mrs. Glazer died of a pulmonary embolism caused by an embolus that formed in a vein in her lower extremities; that the embolism was not caused by the perforation of the esophagus.

We find nothing in the record which would have supported a conclusion by the jury that there was a causal

connection between the esophagoscopy and Mrs. Glazer's death, had the jury returned a verdict for plaintiff. It was error, therefore, for the court to submit the case to the jury, even though the jury returned a verdict for defendant.

We turn now to the first category of plaintiff's assignments of error—alleged errors occurring during the trial of the case.

First, plaintiff assigns error to the trial court's denial of an offer of proof by plaintiff's counsel on cross-examination of one of the physicians. The offer contains facts from which a conclusion could be drawn in support of counsel's statement, made in chambers in the absence of the jury, that ". . . the man is nuttier than a fruit cake. . . ."

▆ The same error was urged on plaintiff's motion for a new trial. We adopt the reasoning of the trial judge, expressed in his written memorandum opinion:

"It seems clear the plaintiff's chief counsel was attempting to degrade, humiliate or disgrace the witness in order to discredit him and to create prejudice against him in the eyes of the jury. If so, the trial judge has a duty to protect the witness from questions that are too irrelevant or too remote to affect credibility. *Jones on Evidence,* (Fifth Ed.) Sec. 920, 921. *Conrad—Modern Trial Evidence, Sec. 1132.* The extent to which cross-examination is permitted in such case is largely within the discretion of the trial court. State v. Belknap, 44 Wash. 605. See also *98 CJS 199* et seq."

The scope of cross-examination is peculiarly within the discretion of the trial judge. *State v. Robinson,* 61 Wn. (2d) 107, 377 P. (2d) 248 (1962), and cases cited. We find no abuse of discretion.

▆▆ Second: Plaintiff assigns error to the court's permitting defendant to testify as an expert. The assignment is without merit for several reasons. No reference is made to the record, as required by Rule on Appeal 42(f); RCW Vol. 0. No authority is cited in support of the contention. See *Frey v. Kent City Nursing Home, Inc.,* 62 Wn. (2d) 953, 385 P. (2d) 323 (1963). Plaintiff called defendant as an adverse witness, qualified him as an expert, and examined him at length as an expert. Any objection, if made, was

waived. *Wollan v. Billett,* 60 Wn. (2d) 677, 375 P. (2d) 146 (1962).

Third: We agree with the trial court that plaintiff's suggested hypothetical question was an improper one. In such matters, the trial judge has wide discretion, and we cannot say, from the record, that he abused it.

Fourth: Plaintiff urges that the court erred when it sustained an objection to a question on the ground it was argumentative. We agree with the trial court; the question was obviously argumentative, and the trial court did not err when it sustained defendant's objection thereto.

The remainder of plaintiff's argument, purportedly in support of assignment of error No. 4, is a preface to plaintiff's second and third categories of his assignments of error which, in view of our conclusion, we need not consider.

The judgment of dismissal is affirmed.

OTT, C. J., FINLEY and HAMILTON, JJ., and MURRAY, J. Pro Tem., concur.